IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 17, 2019

## ROBERT AARON WHITE v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
**No. 40901441      William R. Goodman, III, Judge**

_____

### No. M2018-01861-CCA-R3-PC

_____

A Montgomery County Grand jury indicted the Petitioner, Robert Aaron White, for multiple offenses including first-degree, premeditated murder. A petit jury convicted the Petitioner of the lesser included offense of second-degree murder, and he received a sentence of twenty-three years imprisonment. State v. Robert Aaron White, No. M2011-01985-CCA-R3-CD, 2013 WL 2432372, at *1 (Tenn. Crim. App. June 4, 2013). Following denial of his appeal, the Petitioner filed a petition seeking post-conviction relief, alleging, inter alia, that trial counsel was ineffective based on the following grounds: (1) failure to investigate the victim's criminal history and to introduce at trial evidence of the victim's prior bad acts, (2) failure to investigate and introduce evidence of the prior bad acts of one of the State's witnesses, and (3) failure to properly move the trial court for an order allowing the Petitioner to cover his tattoos at trial.[1] The post-conviction court denied relief by written order, and the Petitioner appealed. Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and D. KELLY THOMAS, JR., J., joined.

Douglas A. Trant and Julia Anna Trant, Knoxville, Tennessee, for the Petitioner, Robert Aaron White.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Robert Nash, Assistant District Attorney General, for the Appellee, State of Tennessee.

_____

[1] The Petitioner raised over 50 additional issues in his pro se and amended petitions for post-conviction relief. Because the above three issues are the only issues raised in his brief before this court, any other remaining issues are waived.

# OPINION

As relevant to the issues raised in this appeal, the facts as outlined in our opinion affirming the Petitioner's conviction on direct appeal provide as follows:

On October 6, 2009, William Rostorfer went to the home of the victim, Jimmy Yeager, with Mr. Rostorfer's mother-in-law, Luella Tower, to pick up [the victim] and take him back to Ms. Tower's house. When they arrived, [the victim] "was upset." Mr. Rostorfer testified that [the victim] was on the phone "with some guy, and they were arguing and fighting." As they were getting ready to leave, they saw a red car "coming down the hill." The car drove slowly past the driveway and turned around and came back. Mr. Rostorfer and [the victim] handed their keys and wallet to Ms. Tower and walked down the driveway toward the road. Mr. Rostorfer testified that he "was just worried [the victim] might get jumped[.]" He testified that the red car stopped in front of the driveway, and he heard "'I've got something for you and pop." He heard "a couple of pops [gunshots]," and he ducked and ran. He could not see how many people were inside the car. He saw a "flash coming out of the car." He testified that the victim "was squirting blood out of his back," and thus Mr. Rostorfer knew the victim had been shot. The victim told Mr. Rostorfer that [the Petitioner] "was the one that did it." Mr. Rostorfer did not know [the Petitioner] before the incident. He testified that since the incident, [the Petitioner] told him, "'if nobody testified [,] then [Rostorfer's] family would quit getting threatened.'" [The Petitioner] told him that while the two men were incarcerated together. He testified that he and the victim were about ten feet away from the car when the shots were fired and that no one ever got out of the car.

Luella Tower testified that [the victim] had called her on the night of the incident and asked her to pick him up and take him to her house. When she got there[,] he told her that someone was coming to his house to fight him. She testified that they were standing in the driveway talking. [The victim] said that he was going inside to get a shirt when they saw a car drive down the street and turn around. [The victim] said, "'that's him'" and told Ms. Tower to get in her car. She got in her car and watched [the victim] and Mr. Rostorfer walk down the driveway towards the car. They said they didn't "want no trouble [sic]." She then heard someone inside the car say [,] "'I got something for you," and she heard gunshots. She could not identify anyone inside the vehicle. Mr. Gay lay [the victim] in the

grass. [The victim] told Ms. Tower that he was dying and that [the Petitioner] had shot him.

Scott Gay went to [the victim's] house with Ms. Tower. He testified that when they arrived, [the victim] "was saying something about fighting somebody, with Robert or with Rob." Mr. Gay was standing in [the victim's] driveway when he saw a red car drive past and turn around and stop at the end of the driveway. [The victim] said, "here he is," and [the victim] and Mr. Rostorfer walked towards the car. [Mr. Gay] saw the driver of the vehicle and identified [the Petitioner] at trial as the driver. Mr. Gay heard [the victim] say, "holy shit" and run back up the driveway. Mr. Gay then heard gunshots and saw [the victim] get hit. Mr. Gay testified that "about three weeks [earlier, the Petitioner] jumped [him] from behind." He testified that he went to [the victim's] house on that prior occasion "because he ha[d] some beers over there," and that [the Petitioner] was also there. Mr. Gay testified that it was a "one-sided beating."

Assistant medical examiner John Davis performed the victim's autopsy. The victim died from a gunshot wound to the torso, and the manner of death was homicide. The bullet entered the victim's back and exited his chest. There was no soot or stippling around the wound, indicating that the victim was shot from "at least two feet away." The victim had multiple tattoos on his arms, torso, head and neck.

\*\*\*

Investigators recovered two shell casings in the road. The victim and Mr. Gay and Mr. Rostorfer were unarmed.

\*\*\*

[The Petitioner] testified that he was 29 years old at the time of trial. He moved with his then wife from California to Tennessee in 2004. In October 2009, he was living in Clarksville with his girlfriend, Valerie Estep, and Ms. Estep's child Kaylee. The victim's brother Darren was the father of Ms. Estep's child, and [the Petitioner] took the child to see the victim and his mother because "Valerie d[id]n't want nothing [sic] to do with the Yeagers, whether it's Margarita [the child's grandmother] or Kaylee's father." [The Petitioner] testified, "I like Margarita. I feel bad for what

happened. I liked [the victim]." [The Petitioner] testified that before they "started falling out towards the end of [their] relationship [they] were always together." [The Petitioner] eventually "cut[ ] ties with [the victim]" because of incidents between Ms. Yeager and Ms. Estep involving the victim's niece. [The Petitioner] testified that for two weeks prior to the shooting, he refused to answer [the victim's] phone calls.

[The Petitioner] testified that he gave [the victim] tattoos. He testified that [the victim] wanted a tattoo on his face, and [the Petitioner] "wrote Kaylee [and] stamped it on his face." He also "put a cross on his cheek ..., and [he] put a teardrop on his eye ..., on his left side." [The Petitioner] also "put So Cal for southern California" on [the victim's] neck. [The Petitioner] testified that [the victim] wanted a teardrop tattoo "[b]ecause [the victim] told [the Petitioner] he [had] killed someone before."

[The Petitioner] testified that on October 6, 2009, [the victim] "wanted to fight" him. He testified that [the victim] "wouldn't stop calling," and [the Petitioner] tried to ignore [the victim's] calls. [The Petitioner] testified that he "didn't want no [sic] problem" and that he "was already scared of [the victim]." [The Petitioner] drove to [the victim's] house and took "some beers" with him. As he approached the house, he saw [the victim] and "that big ole white boy," and [the Petitioner] drove past the house and turned around because the road ended at a dead end. As he drove back towards the house, he saw [the victim] and Mr. Rostorfer throwing their shirts down and "com[ing] down the driveway." He saw Mr. Rostorfer "reaching behind his back." Rostorfer and [the victim] were "about seven to ten feet" away from [the Petitioner's] car, and [the Petitioner] "grab[bed][his] pistol [and he] bust twice." He testified that the two men were larger than him and they were "bum-rushing him" and he was afraid they were "going to beat the shit out of [him]." [The Petitioner] shot twice. Then he turned away from them and shot once more and drove away. [The Petitioner] testified that he "never, ever, ever, ever, never once ... aimed at anybody; [he] never once deliberately tried to shoot [the victim]." He testified he "was trying to back them up off of [him]" and that he "had zero intentions of killing anybody."

Id. at *2-4.

- 4 -

Based on the above proof, the jury convicted the Petitioner of the lesser included offense of second-degree murder. In his direct appeal to this court, the Petitioner raised issues similar to the issues raised in this appeal; namely, whether the evidence was sufficient to support his conviction and whether the trial court erred in refusing to allow the Petitioner to cover his facial tattoos during trial. Robert Aaron White, 2013 WL 2432372, at *1. In review of the sufficiency of the evidence, the Petitioner argued, inter alia, that the State failed to prove that the Petitioner did not act in self-defense because multiple witnesses testified that the victim and Rostorfer intended to shoot him or drag him from his vehicle and beat him. This court observed that the Petitioner's self-defense theory was rejected by the jury and reasoned further as follows:

> While there was evidence at trial that the victim anticipated a fight with [Petitioner], we conclude that the State sufficiently proved that [Petitioner] did not act in self-defense when he fired three shots out of his car window at Rostorfer and the victim, striking the unarmed victim in the back, and then drove away. Although [Petitioner] testified that he was afraid of [the victim] and Rostorfer, he drove to [the victim's] house and fired his gun from a moving car without knowing whether the victim was armed or unarmed.

Robert Aaron White, 2013 WL 2432372, at *6. Finally, the Petitioner argued that he was "unfairly prejudiced by the trial court's *refusal* to allow" the Petitioner to cover his facial tattoos with makeup during trial. (Emphasis in original). The Petitioner asserted that his tattoos "had no relevant purpose at trial" because he did not dispute his identity as the shooter. This court determined that the Petitioner had waived this issue by failing to raise it at trial and by having first raised the issue in his motion for new trial. Id.

On June 2, 2014, the Petitioner filed a pro se petition for post-conviction relief, raising fifty-seven claims of ineffective assistance of counsel. Following the appointment of counsel, the Petitioner filed five amended petitions for post-conviction relief, raising several additional claims for relief. The post-conviction court held an evidentiary hearing on August 14, 2018.

Before the hearing, the victim's criminal history with affidavits were provided as an addendum to the post-conviction petition and subsequently admitted as an exhibit to the hearing. There was no testimony from the affiant's or the complainant's regarding the offenses listed in victim's criminal history. The Petitioner testified that he knew the victim, Jimmy Yeager, prior to the offense, because the Petitioner was dating Valerie Estep, and the victim's brother is the father of Estep's daughter. The Petitioner intimated that he served as an intermediary between the victim's mother and Estep on childcare

arrangements because Estep "had issues" with the Yeager family. At trial, the Petitioner also explained that a few weeks before the offense he "had words" with the victim's mother concerning her granddaughter, which angered the victim and prompted him to want to fight the Petitioner. Prior to this, the Petitioner had maintained a good relationship with the victim and the Yeager family. The Petitioner believed in maintaining this relationship because he hoped "whoever [was] around [his daughter] would allow her grandmother to see her."

The Petitioner said that he spent a lot of time with the victim and described the victim as aggressive. He described himself, however, as "a little guy[.]" "[T]he [victim] [was] a lot bigger than me but would get drunk and just get belligerent and want to fight a lot or try to destroy my property[.]" The Petitioner also testified that prior to trial he advised trial counsel (1) that he witnessed the victim beat up his mother; (2) that the Petitioner had tattooed a teardrop under the victim's left eye, a symbol that a person had killed another, because the victim told him that he had, in fact, killed someone; (3) that he was scared of the victim because "he was a big old guy[;]" and (4) that the victim was a member of a gang. The Petitioner stated that he knew the victim had a criminal record, and, when asked if he told his trial counsel about this, he said, "I mean, it's public record."

The Petitioner testified that he also knew William Rostorfer, a witness for the State at trial, and described him as a "really big white guy who thought he was tough." He told trial counsel to check the Petitioner's phone for records of calls from the victim because the victim would "constantly call [him]…cussing and this and that[,]" and the Petitioner was scared. The Petitioner testified that both the victim and Rostorfer had criminal records and that trial counsel knew about this prior to trial. He stated that the victim had a knife on him that day, and trial counsel "knew that there was a knife on him[.]" The Petitioner testified that he wished to cover his tattoos at trial, that he was not allowed to do so, and that trial counsel "never filed a motion to even let [him] cover his tattoos[.]"

On cross-examination, the Petitioner confirmed that he testified at trial that he put a teardrop tattoo under the victim's left eye and that the victim told him it was because he had killed someone. Regardless of this knowledge, the Petitioner continued to "h[a]ng out" with the victim four to five times a week. Even though the Petitioner told trial counsel that the victim had a criminal history and was in a gang, the Petitioner was aggrieved because trial counsel never asked him about these things during trial. The Petitioner believed he could not raise these issues at his trial on his own. He said that everyone he "hung around with" carried a gun, but he confirmed that he did not see a gun in the possession of the victim or Rostorfer on the night of the offense. The Petitioner believed his "trial was rigged," and he was "bamboozled" by his trial counsel. He also

said he was not asked about Rostorfer's criminal history at trial. On redirect examination, the Petitioner testified that he recalled the State discussing the victim's "run-ins with the law" during its closing argument.

Trial counsel testified that he became an attorney in 2001, and that over fifty percent of his practice at the time of the Petitioner's trial was criminal law. He was retained by the Petitioner and initially talked to the Petitioner's girlfriend and mother. Trial counsel met with the Petitioner frequently at the Montgomery County jail as the case progressed and provided the Petitioner with the discovery. Trial counsel testified as follows about his discussions with the Petitioner concerning the victim's criminal history:

> The issue for us was I don't think he had knowledge of any criminal history, but we had talked about self-defense and what the realities were of using self-defense and so the issue was what's new [sic] [he knew] at the time about [the victim]? And so, when we got closer to trial, we began to prep him for direct examination and the issue is what he could testify to that he knew at the time of trial--at the time of the incident.

Trial counsel told the Petitioner to "testify on the stand to what he knew." He did not remember the Petitioner telling him about the victim beating up his mother. Regarding Rostorfer's criminal history, trial counsel testified that he did not believe that the Petitioner knew Rostorfer very well. He said that part of the Petitioner's defense theory was that the victim and his associates showed signs of aggression towards the Petitioner before he shot the victim.

Trial counsel did not recall the State putting on any proof as to the Petitioner's or the victim's tattoos. He stated that he addressed the issue of tattoos in voir dire and during the Petitioner's testimony. He stated that co-counsel had received makeup from the Petitioner's family to cover up the Petitioner's tattoos at trial, but the trial court did not allow him to use the make-up. He did not remember any discussion surrounding tattoos at trial, other than the victim's teardrop tattoo.

Trial counsel requested and received a jury instruction on self-defense. He did not remember whether the Petitioner told him that the victim was affiliated with a gang. Trial counsel believed that the Petitioner and the victim were in an argument concerning custody of the Petitioner's girlfriend's daughter, who was the victim's niece. Trial counsel recalled that the Petitioner drove over to the victim's house and fired shots when he saw the victim and two others coming down the driveway. Trial counsel said that the Petitioner was afraid of the victim's brother, the father of his girlfriend's child, who was

in prison at the time of the offense. He said the Petitioner had expressed fear that there was going to be a fight over his girlfriend's child.

On cross-examination, trial counsel recalled the State saying in its opening statement that the victim was not a perfect man. He agreed this could have possibly opened the door for him to introduce the victim's criminal record, but he did not do so. He agreed further that it could have been helpful for the jury to know about the victim's criminal record. He said that he spoke with a private investigator who looked into the victim's gang associations. He did not introduce any evidence of gang association at trial because he believed that the Petitioner was also associated with gangs. Trial counsel excluded this evidence, reasoning that he wanted the case to be about a child custody dispute, not gangs. However, trial counsel agreed that the Petitioner never told him that he was in a gang. He agreed that the victim had a teardrop tattoo under his left eye, and he knew this signified that the victim had killed someone.

Trial counsel made an oral motion before trial to allow the Petitioner to cover his tattoos, but he did not file a written motion with the trial court. He agreed that there was no strategic benefit to letting the jury see the Petitioner's tattoos, and, therefore, it was error on his part not to make the motion on the record. Finally, he agreed that the Petitioner told him that he was afraid of the victim and his brother because of their relative sizes. Trial counsel emphasized that the Petitioner did not know the victim's criminal history at the time of the incident. He stated that he and co-counsel had researched the issue of self-defense prior to trial, but he could not recall the exact cases that he relied upon. The Petitioner told trial counsel that he was scared when he saw the victim and Rostorfer coming towards his car, and he understood that they were ready to fight when they took off their shirts. He agreed that it could have been important "to corroborate that fear with the criminal records of [Rostorfer] and [the victim][.]"

On redirect examination, trial counsel emphasized that the Petitioner did not tell him about the victim's gang affiliation. He stated that the Petitioner told him that there was going to be an altercation between him and the victim "whether it was going to happen that night or sometime later[.]" He believed that the Petitioner was fortunate to have received a self-defense jury instruction from the trial court, and he stated that the Petitioner "testified the way [they] had hoped he would[.]" On recross examination, trial counsel testified that the victim and Rostorfer were not the "initial aggressors[.]" When asked about the victim's gang affiliation, trial counsel stated, "I knew that at the very least that there were gang members involved in this case and my concern as far as our strategy was I wanted this to be about a custody case and not to turn it into a gangland killing."

On September 20, 2018, the post-conviction court entered an order denying post-conviction relief. On October 10, 2018, the Petitioner filed a timely notice of appeal, and this case is now properly before this court.

## ANALYSIS

On appeal, the Petitioner argues that trial counsel was ineffective based on the following grounds: (1) failure to investigate the victim's criminal history and to introduce at trial evidence of the victim's prior bad acts, (2) failure to investigate and introduce at trial evidence of prior bad acts of the State's witness, and (3) failure to properly move the trial court for an order allowing the Petitioner to cover his facial tattoos. The State responds that the Petitioner failed to prove these allegations by clear and convincing evidence, and, as such, the post-conviction court properly denied him relief. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Id.

"In evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

**I. Failure to investigate and introduce evidence of the victim's criminal history and prior bad acts.** Relying upon State v. Ruane, 912 S.W.2d 766, 781-82 (Tenn. Crim. App. 1995), abrogated on other grounds by State v. Rogers, 992 S.W.2d 393, 401 (Tenn. 1999), the Petitioner argues that trial counsel was ineffective for failing to investigate and introduce certain evidence which would have corroborated the Petitioner's fear of the victim and bolstered his theory of self-defense at trial. Specifically, the Petitioner insists that the victim's criminal history, the victim's alleged gang affiliation, the significance of the teardrop shaped tattoo under the victim's left eye, and an incident during which the victim had beaten up his mother were all relevant and admissible at trial to establish the victim as the first aggressor. In response, the State contends that the Petitioner has failed to establish that the trial court would have found a factual basis for the victim's alleged "tendencies of first aggression," and that "simply stating that the victim was charged or convicted is not sufficient." For the reasons that follow, we agree with the State.

Generally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). However, when a defendant relies on a theory of self-defense, contending that the alleged victim of a violent crime was the first aggressor, the defense may offer evidence of the victim's prior history of violent conduct. Ruane, 912 S.W.2d at 781-82. To be clear, this court has placed "a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." Id. at 779.

In cases where a defendant seeks to use evidence of the victim's prior bad acts to establish the defendant's own fear of the victim, the defendant must testify that he or she was aware of the victim's prior bad acts against third parties at the time of the alleged self-defense to be admissible as substantive evidence of the defendant's state of mind. State v. Chancy Jones, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *7 (Tenn. Crim. App. Apr. 5, 2012); State v. Samuel Sherrill, No. M2009-01979-CCA-R3-CD, 2011 WL 1564009, at *7 (Tenn. Crim. App. Apr. 21, 2011) (citing Williams v. State, 565 S.W.2d 503, 505 (Tenn. 1978) and State v. Hill, 885 S.W.2d 357, 361 n. 1 (Tenn. Crim. App. 1994)). If the defendant is aware of the prior violent acts, he may testify about what he observed or had been told about the prior acts. Id. If the State questions his basis of knowledge concerning the prior violent acts, then the defendant may introduce the corroborating witnesses in rebuttal. Id. These witnesses may only testify as to what they told the defendant, not as to what they personally observed. Id.

However, in cases where it is alleged that the victim was the first aggressor and the defendant is unaware of the victim's prior bad acts, the defendant may offer evidence through the testimony of a third person to support this assertion. Ruane, 912 S.W.2d at 781-82; Neil P. Coen, et al., Tennessee Law of Evidence § 4.04[5][d] (5th ed. 2005) ("[I]n a criminal case where there is some evidence suggesting that the victim was the first aggressor, the defendant may offer proof of the victim's prior violent acts with third persons."); Hill, 885 S.W.2d at 357; State v. Furlough, 797 S.W.2d 631, 649 (Tenn. Crim. App. Apr. 10, 1990), perm. app. denied (Tenn. July 23, 1990) ("[W]hether the defendant knew of that reputation is irrelevant."). This evidence is considered corroborative evidence, not substantive. Ruane, 912 S.W.2d at 781-82. In other words, the evidence cannot be used substantively, and as such, it is not controlled by Tennessee Rules of Evidence 404(a)(2) and 405. State v. Chancy Jones, No. W2010-02424-CCA-R3-CD, slip op. at 11 (Tenn. Crim. App. Apr. 5, 2012), perm. app. denied (Tenn. Aug. 16, 2012). However, the evidence is "at minimum, subject to the balancing test set forth in Tennessee Rule of Evidence 403." Id. (citing State v. Marquette Houston, No.

W2006-00095-CCA-R3-CD, 2007 WL 1890650, at *8 (Tenn. Crim. App. June 29, 2007), perm. app. denied (Tenn. Nov. 19, 2007)).

Finally, before a trial court can admit evidence of the victim's prior violent acts to corroborate the defendant's claim that the victim was the first aggressor, three requirements must be satisfactorily met: (1) the issue of self-defense must be raised by the proof and not simply by statements of counsel; (2) there must be a factual basis for the defendant's claim that the victim had first aggressor tendencies; and (3) the probative value of the evidence must outweigh the danger of unfair prejudice. Ruane, 912 S.W.2d at 781-82.

In denying relief as to this issue, the post-conviction court determined as follows:

In this case the Petitioner testified, and [he] did not testify as any knowledge of prior violent actions of the victim. Petitioner did testify that he was afraid of the victim because of the size of the victim, but no mention was made of any specific occurrences. The introduction of such criminal record would amount to an effort to prove the character of the victim, in order to show action in conformity with such character trait, which is precluded by Rule 404(b) of the Tennessee Rules of Evidence. This court does not find that counsel was ineffective as a result of not attempting to introduce such criminal record.

Here, the Petitioner argues that he relied on the theory of self-defense at trial, which was undermined by trial counsel's failure to investigate or admit into evidence the criminal history of the victim. We observe at the top of our analysis that the Petitioner conflates the law concerning evidence of the victim's prior bad acts as used to establish the defendant's own fear of the victim with the law concerning prior bad act evidence used to corroborate a defendant's theory of self-defense, alleging the victim was the first aggressor. In either case, the Petitioner has failed to establish deficient performance or prejudice. The record shows that trial counsel did not object to the State's comments in opening statement that the victim "wasn't a perfect man" and had "run-ins with law enforcement." Trial counsel also agreed that the victim's criminal history may have been helpful during trial. Nevertheless, trial counsel repeatedly testified that the Petitioner was not aware of any criminal history of the victim at the time of the offense. Trial counsel emphasized, consistently with the above law, that their strategy was to focus on what the Petitioner knew about the victim at the time of the offense, and that the Petitioner testified consistently with their trial preparation. Accordingly, to the extent the Petitioner sought to admit the victim's criminal history as substantive evidence of his state of mind and fear of the victim, we agree with the post-conviction court, and conclude that the

- 12 -

Petitioner has failed to establish that trial counsel provided ineffective assistance of counsel.

To the extent that the Petitioner sought to admit the victim's criminal history to corroborate his theory of self-defense and show that the victim was the first aggressor, the record shows that trial counsel was primarily concerned with mitigating the first-degree premeditated murder charge. Trial counsel focused on the events immediately prior to the shooting, when the Petitioner observed the victim and the two other men in the driveway, walking toward the Petitioner's car and taking their shirts off. Trial counsel further explained that in "[the Petitioner's] world," these actions were aggressive and threatening. However, trial counsel was leery of categorizing the victim as the "initial" aggressor because the Petitioner drove to the victim's house, was armed with a gun, shot outside the window of his car multiple times, and struck the unarmed victim in the back. In fact, trial counsel agreed that he was fortunate to have received a self-defense instruction from the trial court. With this said, the first Ruane factor, whether the issue of self-defense is raised by the proof, is satisfied, albeit marginally so.

Next, we must determine the second Ruane factor, whether there is a factual basis for the Petitioner's claim that the victim had first aggressor tendencies. In support of this factor, the Petitioner admitted as an exhibit the victim's criminal history along with supporting affidavits of complaint. However, this court has repeatedly held the fact of a conviction or an arrest alone is inadequate to corroborate allegations that a victim may have been the first aggressor; instead, the defendant must present competent proof of the underlying facts of the alleged prior acts of aggression. State v. Laterral Jolly, No. 02C01-9207-CR-00169, 1993 WL 523590, at *4 (Tenn. Crim. App. Dec. 15, 1993) ("The mere fact that one has a conviction on his record, does not necessarily prove that he was the first aggressor, or that he even committed an aggressive act. . . . Rather than considering the record of conviction alone, the trial court must determine the underlying facts of the alleged act of aggression."), perm. app. denied (Tenn. May 16, 1994); see also Chancy Jones, 2012 WL 1143583, at *8 (concluding that the victim's "orders of protection were not relevant on the issue of the victim's first-aggressor tendencies without some evidence regarding the factual basis supporting the protective orders"); Derek T. Payne v. State, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *14 (Tenn. Crim. App. Jan. 15, 2010) (evidence failed to support claim of a violent reputation or prior violent acts where the Petitioner offered only a "Record of Arrest" which showed that the victim was arrested for unlawful possession of a weapon, and an affidavit of complaint showing facts leading to a misdemeanor conviction for harassment). Because the Petitioner failed to provide *any* testimony explaining the underlying nature, circumstances, or outcome of the offenses listed in the victim's criminal history and supporting affidavits, we are unable to evaluate the third Ruane factor. Accordingly,

based on this record, the Petitioner has failed to establish deficient performance or that he was prejudiced by counsel's failure to investigate or introduce the victim's criminal history at trial. The Petitioner is not entitled to relief.

In a related issue, the Petitioner also argues that trial counsel was ineffective for failing to introduce evidence that the victim had beaten up his mother and evidence that the victim was affiliated with a gang. Generally citing "the Ruane Rule," but without providing this court with argument or analysis, the Petitioner claims this evidence would have substantiated his claim that he was in fear of the victim and strengthened his claim of self-defense. At the post-conviction hearing, trial counsel testified that he did not remember the Petitioner telling him that the victim had beaten his mother. Trial counsel also intentionally chose not to inquire about the victim's gang affiliation because he wanted the case to be centered on a child custody dispute rather than a "gangland killing." The post-conviction court determined that the Petitioner testified at trial and did not testify concerning his knowledge of the incident between the victim's mother and the victim. The post-conviction court impliedly accredited the testimony of trial counsel and determined that the Petitioner failed to establish prejudice. The record does not preponderate against the finding of the post-conviction court regarding the incident between the victim and his mother. We also conclude that trial counsel engaged in an informed and reasonable trial strategy in not asking the Petitioner about the victim's gang affiliation. The Petitioner is not entitled to relief as to this issue.

Finally, the Petitioner contends that trial counsel was deficient in failing to introduce any evidence at trial regarding the significance of the victim's teardrop tattoo, which would have served to corroborate the Petitioner's fear of the victim. He also argues that trial counsel failed to object to the State's introduction of a photograph of the victim without facial tattoos. Contrary to the Petitioner's argument, the record of the trial transcript reflects that trial counsel did in fact ask the Petitioner what the Petitioner had tattooed on the victim, and the Petitioner said that he put a teardrop under his left eye. The Petitioner further testified at trial that the victim told him he wanted a teardrop tattoo because the victim had killed someone before. In so much as the Petitioner claims that the State's photograph of the victim without the teardrop tattoo discredited his testimony and mislead the jury, we note that the medical examiner also testified as to the condition of the victim's body at the time of the offense. The medical examiner testified that the victim had multiple tattoos on the victim's arms, torso, head, and neck. On cross-examination, defense counsel specifically asked the medical examiner whether the victim had a teardrop shaped tattoo on his body. The medical examiner confirmed that the victim had a teardrop shaped tattoo underneath his left eye at the time of the autopsy. The Petitioner has failed to establish deficient performance or prejudice to his case in regard to this issue.

- 14 -

**II. Failure to introduce William Rostorfer's prior bad acts.** Next, the Petitioner again relies generally on Ruane in arguing that trial counsel was ineffective for failing to introduce evidence of Rostorfer's prior bad acts, which he claims would have bolstered his self-defense theory. He claims that Rostorfer's charges of aggravated assault, reckless homicide, and negligent homicide should have been admitted into evidence at trial, even though these charges were ultimately dismissed. A review of the trial transcript shows that Rostorfer testified that he had "never seen [the Petitioner] before [the offense date], never even heard his name before that day[.]" At the post-conviction hearing, trial counsel testified that he did not believe that the Petitioner knew Rostorfer very well at the time of the incident. Trial counsel also agreed that it could have been important to the Petitioner's self-defense theory to introduce evidence of Rostorfer's prior bad acts. However, the only proof of Rostorfer's charges was a three-page, court print out, which was an addendum to the Petitioner's third amendment to his petition for post-conviction relief. Accordingly, based on the same authority articulated in section I, infra, concerning this court's inability to evaluate the victim's criminal history, the Petitioner has failed to establish deficient performance or prejudice. The Petitioner is not entitled to relief on this issue.

**III. Failure to file a written motion to allow the Petitioner to use makeup to cover his tattoos at trial.** The Petitioner contends that trial counsel was ineffective in failing to make a formal motion on the record to allow the Petitioner to cover his facial tattoos with makeup at trial. He argues that "people with facial tattoos might already be at a greater risk to be judged guilty and to go to prison in the first place[.]" Friederike Funk and Alexander Todorov, Criminal Stereotypes in the Courtroom: Facial Tattoos Affect Guilt and Punishment Differently, Psychology, Public Policy, and Law, Vol. 19 No. 4, 466-478 (2013). In response, the State contends that "the [P]etitioner is not entitled to relief because he has failed to show he would have prevailed on appeal had the issue been properly preserved." We agree with the State.

In its order denying relief as to this issue, the post-conviction court reasoned, in pertinent part, as follows:

> Petitioner contends trial counsel was ineffective by not filing a written motion seeking to have the tattoos on the face of the Petitioner covered with makeup. The record reflects that counsel made an oral request of the trial judge, but that such request was denied. While there does not appear to be any Tennessee cases dealing with this issue, it is noted that the California courts have considered the issue in this case of U.S. v. Quintero, 933 F.2d 1017 (Cal. 1991), in which the court held that all tattoos, as a

general matter, do not create juror prejudice sufficient to violate a Defendant's right to a fair trial. A Texas court, in the case of Gonzalez v. Quarterman, 458 F.3d 384 (2006), in considering a case in which the Defendant was before the court on a Writ of Habeas Corpus, after having been found guilty of capital murder in state court, found that the Defendant had not received ineffective assistance of counsel as a result of the prosecution introducing a witness testifying concerning teardrops tattooed on the face of the Defendant. The court reasoned that tattoos are subject to various interpretations, and that there was no proof as to whether such teardrops related to the subject offense. Gonzalez v. Quarterman, 458 F.3d, at 395 (Texas 2006). As relates to this issue this court finds that the Petitioner has failed to establish by clear and convincing evidence that counsel's performance was deficient.

We conclude that the Petitioner is not entitled to relief. Although trial counsel made an oral motion with the trial court to allow the Petitioner to cover his tattoos with makeup, it was denied. Trial counsel addressed the issue of tattoos during voir dire and established that the Petitioner was a tattoo artist. On direct appeal, this court found "no request by the trial court to allow [the Petitioner] to the trial court to allow him to cover his facial tattoos," Robert Aaron White, 2013 WL 2432372, at *6, and concluded that the issue was waived. At the evidentiary hearing, trial counsel agreed that it was error not to file a formal motion with the trial court on this issue. Significantly, the Petitioner did not provide any evidence preserving his facial tattoos, i.e. photographs or at the very least a detailed description, for this court to review.[2] The Petitioner makes only a general claim that his "numerous visible tattoos, including some on his face" had a "potentially prejudicially effect" on the jury. Because we have no meaningful way of evaluating this issue, the Petitioner has failed to establish deficient performance. We likewise conclude, based on the overwhelming evidence of the Petitioner's guilt, that allowing the Petitioner to conceal his tattoos would not have changed the outcome of his trial.

Finally, the Petitioner seeks relief based on the cumulative error doctrine, which provides, in short, as follows:

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a

---

[2] Although the trial transcript contains a "mugshot" photograph of the Petitioner, we are unclear whether he appeared the same way at trial.

cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010) (citations omitted).  Therefore, "[t]o warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings."  Id.  Because we found that trial counsel was not ineffective on any of the grounds raised by the Petitioner, the Petitioner is not entitled to relief under the cumulative error doctrine.

## **CONCLUSION**

Based on the above authority and analysis, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. MCMULLEN, JUDGE

- 17 -